IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NEW WEST, an Illinois Limited Partnership, | ) | |
| NEW BLUFF, an Illinois Limited Partnership, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.   19 C 4211 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| BEN CARSON, Secretary of the United States | ) | |
| Department of Housing and Urban Development, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs New West and New Bluff, both Illinois Limited Partnerships, have brought a two count complaint against defendant Ben Carson, Secretary of the Department of Housing and Urban Development ("HUD"), alleging that HUD breached the terms of certain Security Agreements and converted a "Reserve Fund for Replacement" (the "reserve fund") that plaintiffs claim was due to them upon termination of the Security Agreements.   The parties have filed cross motions for summary judgment.   For the reasons described below, defendant's motion is granted and plaintiff's motion is denied.

**BACKGROUND**

This is the latest episode in a long running saga that began in 2005 when the City of Joliet, Illinois, sought to condemn the Evergreen Terrace apartments that were owned by plaintiffs and operated as subsidized housing under Section 8 of the Housing Act of 1937, 42 U.S.C. § 1437f, pursuant to agreements with HUD.   Joliet brought condemnation proceedings in state court

seeking to acquire the property by eminent domain. That suit was removed to federal court, HUD was added as a defendant, and ultimately the case resulted in a number of opinions by the Seventh Circuit. See City of Joliet v. New West, L.P., 921 F.3d 693 (7th Cir. 2019) (and cases cited therein). Plaintiffs countered with a suit against Joliet for violating the Fair Housing Act as well as many other state and federal claims. That suit was dismissed by the District Judge after resolution of the condemnation case. The dismissal was affirmed on appeal. New West L.P. v. City of Joliet, 891 F.3d 271 (7th Cir. 2018).

Most of the history and disputes between plaintiffs, HUD, and Joliet can be gleaned from the various Seventh Circuit opinions issued in the two cases. Some background is necessary, however, to understand the instant dispute. Evergreen Terrace was constructed in the 1960s and operated as a low-income project subsidized under Section 8 of the Housing Act of 1937. Section 8 is the primary means through which HUD aids low income families in obtaining decent housing. Owners of Section 8 projects enter into housing-assistance-payments ("HAP") contracts with HUD. In consideration for receiving Section 8 funds from HUD, the HAP contracts impose certain obligations on the owners of assisted properties, including the leasing of assisted units to Section 8 eligible families, and the maintenance of the project as decent, safe and sanitary housing for the residents.

By the mid to late-1970s, HUD had acquired the Evergreen Terrace project after foreclosure of the original owners' defaulted mortgage. Plaintiffs were formed in 1980 and 1982 to purchase the Evergreen Terrace project from HUD. Plaintiffs purchased the project from HUD in 1982 and 1983 for two dollars and took out a mortgage loan that HUD insured. Upon acquiring the project, plaintiffs entered into 20-year HAP contracts for the project. Those contracts were

entered pursuant to new regulations in 24 C.F.R. part 880 and 881, which required that the funds "must be used for the benefit of the project, to make required deposits to the replacement reserve in accordance with §880.602 and to provide distributions to the owner as provided in… §881.205."

In 2001, plaintiffs asked HUD to restructure the mortgages and renew the HAP contracts under the Multifamily Assisted Housing Reform And Affordability Act of 1997, 42 U.S.C. § 1437f note ("MAHRA"), which was enacted to preserve Section 8 rental projects at a lower overall cost to the government by restructuring the mortgage debt to reduce operating costs, while allowing a concomitant reduction in rental subsidies needed to meet operating costs and funding rehabilitation to address deferred maintenance of projects.   The Act requires owners to make needed repairs and agree to maintain the properties as low-income housing for at least thirty years.

HUD approved the restructuring under MAHRA in 2006, paid off the original lenders, and became the lender and mortgage holder itself.   By approving the restructuring, HUD also approved the HAP renewal contracts at "exception rate" levels that were more than twice the market rates.   Plaintiffs agreed to use project funds from those exception rents to make deposits to the reserve-for-replacement accounts as required by regulation.

As part of the restructuring, plaintiffs executed security agreements that "further secured the repayment of the Indebtedness."   Those agreements required plaintiffs to grant security in the collateral, warrant and perfect the lien, maintain and defend the collateral, and pay fees.    Hud's only obligation under the agreements was "to execute a Termination Statement and any other documents reasonably necessary to terminate [the security agreements ] and release the Collateral from the Security Interest."   The security agreements did not specify the manner or mode of

disposition of the collateral. The reserve-for replacement funds at issue were listed among the collateral securing the indebtedness.

While plaintiffs' refinancing application was pending with HUD, Joliet filed the condemnation proceeding in state court, asserting that the properties were "so run-down that [they] constituted a public nuisance." That complaint was removed to the district court and HUD was added as a defendant. After the Seventh Circuit resolved a number of appeals, the district court (Judge Norgle) conducted a 100 day bench trial. While that trial was pending, in 2013 HUD and Joliet entered into a settlement agreement. That settlement agreement provided that if Joliet acquired title to the properties by order of the court or settlement, the proceeds of any condemnation award or compensation was to be applied to payment of the HUD loans, and any balance remaining would be paid by Joliet. The settlement agreement also provided that, "It is acknowledged that the replacement reserves for [the properties] are required to be and are being deposited into and held in accounts controlled by HUD pursuant to 24 C.F.R. § 880.602. Following Acquisition, the Reserves will remain project funds which will continue to be used for the benefit of the Property, subject to the requirements of the Acquisition HAP Contracts and other program requirements."

Plaintiffs were not parties to the settlement agreement, but were granted leave to file and did file objections to its entry. Those objections focused on what plaintiffs described as the proposed transfer of the replacement reserves to Joliet, arguing that it would result in an impermissible taking of plaintiffs' property without just compensation. Those objections were implicitly overruled because the court approved and entered the settlement agreement.

The court ordered the property condemned on September 17, 2014. A jury later awarded plaintiffs $15, 077,406.00 in just compensation, which was more than enough to satisfy the outstanding mortgages. Per the settlement agreement the funds were used to pay off the outstanding mortgages and loan notes. Under the terms of the security agreements, those mortgages and notes were terminated upon the payment of the indebtedness, and HUD was required to release the collateral from the security interest. After the mortgage debt was satisfied, HUD filed UCC Termination Statements ending its security interest in the collateral.

On August 25, 2017, the court granted Joliet's motion for immediate vesting of title and, over plaintiffs' objections, granted Joliet's request that the reserve funds be transferred to an account in its name, concluding that the funds were under HUD's control and that 24 C.F.R. § 880.602 required that the reserves be held and used for the benefit of the properties. It ordered the defendants (plaintiffs in the instant case) to transfer the funds to accounts designated by Joliet to be controlled by HUD. The Seventh Circuit vacated that order, concluding that only HUD, which controlled the accounts, could transfer them, and HUD had been dismissed from the case and never brought back in. The court then instructed plaintiffs to file a new suit, naming HUD as the defendant, rather than adding the issue to a concluded condemnation proceeding. Joliet v. New West, 921 F.3d, 693, 695 (7th Cir. 2019). The instant suit is a result of that order.

## DISCUSSION

The parties have filed cross-motions for summary judgment. Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   The party seeking summary

judgment has the burden of establishing that there is no genuine dispute as to any material fact.

See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   In determining whether a genuine issue

of material fact exists, the court must construe all facts and reasonable inferences in the light

most favorable to the nonmoving party.   See CTL ex rel. Trebatosky v. Ashland Sch. Dist., 743

F.3d 524, 528 (7th Cir. 2014). But the nonmovant "is only entitled to the benefit of inferences

supported by admissible evidence, not those 'supported only by speculation or conjecture.'"

Grant v. Trus. of Ind. Univ., 870 F.3d 562, 568 (7th Cir. 2017).     In the instant case, few if any

material facts are disputed.   The parties have submitted all the relevant contracts and documents

for the court's review.[1]   The arguments are legal in nature and the dispute is ripe for resolution

by summary judgment.

Plaintiff's argument is somewhat appealing in its simplicity.   The reserve funds at issue

were listed in the security agreements as collateral for the mortgage loans.   Under the terms of

the security agreements, those agreements terminated once the indebtedness was paid in full.

When that happened HUD was required to release the collateral, including the reserve fund.

According to plaintiffs, "under Illinois law, 'the primary duty of a pledgee is to return the article

pledged to the pledgor immediately upon the performance of the obligation for which the

security was given, or on tender of such performance, and his refusal so to do amounts to a

wrongful conversion.'"   Telemark Dev. Group, Inc. v. Mengelt, 313 F.3d 972, 977 (7th Cir.

---

1 HUD has asked the court to strike or disregard the declaration of plaintiffs' attorney, Joshua Redman, as violative of L.R. 56.   Mr. Redman's declaration merely submits an index of the exhibits attached to plaintiffs' L.R. 56.1(a)(3) statement and attests that the exhibits are true and correct copies.   Because HUD does not contest that the exhibits are true and correct copies, the court declines to strike the declaration.

2002) (quoting Cotttrell v. Gerson, 20 N.E.2d 74, 78 (Ill. 1939)).   Because HUD has not

returned the reserve funds, plaintiff asserts that HUD has breached the security agreements and

converted its funds.

Although appealing, the argument is too simplistic.   First, as HUD argues, upon payment

of the indebtedness, the security agreements required only that HUD "execute a Termination

Statement and any other documents reasonably necessary to terminate this Agreement and

release the Collateral from the Security Interest."   HUD fulfilled that obligation by filing the

UCC Termination Statements that ended HUD's security interest.   Nothing in the security

agreements   directed HUD to transfer the reserve fund accounts to plaintiffs.   Thus, HUD

argues that it has not breached the security agreements.   And, as both sides recognize, plaintiffs

cannot bring a claim against HUD for the tort of conversion without at least first exhausting its

administrative remedies under the Federal Torts Claims Act, 28 U.S.C. § 2860(h), which

plaintiffs have not done.

This argument is also a bit simplistic.   Neither argument explains what is to become of

the reserve funds when the mortgages are paid and, more importantly, when the HAP contracts

are terminated.   The reserve funds are creatures of contract and regulations.   Section 2.6 (c)(1)

of the HAP contracts that plaintiffs signed required the creation of the reserve or replacement

accounts in accordance with applicable regulations.   The applicable regulations require the

funds be established, 24 C.F.R. § 880.602(a), and that they be funded with "project funds."   Id.

at § 880.601(e)(1).   There is no dispute that plaintiff funded the reserve funds with portions of

the exception rate rents it received from HUD.   Thus, there can be no dispute that the reserves

consist of "project funds."   In addition, the regulations provide that project funds "must be used

7

for the benefit of the project, to make required deposits into the replacement reserve . . . and to provide distributions to the owner . . . as appropriate." Id.  Section 2.6 (b) (1) of the contracts mirrors this requirement.  And both the regulations and the contract provide that to the extent that HUD determines that project funds are more than needed for those purposes, the surplus project funds must be deposited with the mortgagee (HUD) in an interest bearing account. Upon termination of the contract, any excess funds must be remitted to HUD.  Id.  Thus, the question is whether the reserve funds can be considered excess funds which should be remitted to HUD.

The court concludes that the reserve funds should be considered excess project funds even though plaintiffs are correct that the contracts define excess funds as surplus project funds after the reserve account has been fully funded.  As plaintiffs argue, it is the interest bearing account created with project funds that HUD determined were more than needed for the defined purposes of project funds that the regulations and contracts require to be remitted to HUD when the contract is terminated.  Nonetheless, there is no doubt that the reserve fund accounts, like the excess account, consists solely of project funds that are to be used only for the project. Moreover, the reserve funds were to be used solely for the maintenance or repair of the project property.  At the time the contracts were terminated the project was obviously in such disrepair that it was condemned.  It would be contrary to the intent of the regulations and contracts to return the reserve funds to plaintiffs when they had failed to maintain and repair the property.

For these reasons, the court concludes that at the end of the HAP contracts the reserve accounts consisted of project funds that HUD continued to control for continued use of the

8

project.   Consequently, the court grants defendant's motion for summary judgment [Doc. 44]

and denies plaintiffs' motion for summary judgment [Doc. 39].

**ENTER:**

> **DATE: February 4, 2021**

**Robert W. Gettleman**
**United States District Judge**